## 67169. SIERRA ASSOCIATES, LTD. et al. v. CONTINENTAL ILLINOIS NATIONAL BANK & TRUST COMPANY OF CHICAGO.

QUILLIAN, Presiding Judge.

Sierra Associates, Limited, a Georgia limited partnership, on November 26, 1974, executed a deed to secure debt, and promissory note in the amount of $1,005,327.00, to the Hamilton Mortgage Corporation for the purchase of the Gray Fox apartment complex in Atlanta. The note was payable on May 26, 1976. Sierra is composed of William Wallace — general partner, 40%; Heritage Equities Company — general partner, 40%; and William Bradford, limited partner — 20%. Heritage Equities is a Georgia general partnership — with Howe Whitman as the sole general partner. There were two other partners in Heritage but they are not involved in this litigation. The note executed by Sierra for the purchase of the Gray Fox

contained an exculpatory clause. Neither Sierra, Heritage Equities, nor the individuals involved in the purchase were personally liable on the promissory note. Hamilton's only recourse was against the property securing the note — the Gray Fox apartments. Sierra owned the property but it was operated by Southern Heritage.

Whitman and Wallace were involved in the ownership and management of several Atlanta apartment complexes. During the summer of 1975 Whitman and Wallace discussed a severance of their interests in all of their jointly owned properties. This discussion was over a period of weeks prior to November, 1975. Although there was general agreement about the breakup, there was no agreement as to which person would take specific properties.

When Sierra took over the Gray Fox apartments, the 104 units had 4 renters with leases who were making rental payments. During 1975 and 1976 occupancy was expanded to 90%, but the property never had sufficient income to pay expenses, repairs, taxes, management fees, and interest on the mortgage. On June 27, 1975, in an asset swap, Hamilton Mortgage assigned to Continental Illinois National Bank and Trust Company of Chicago (CINB) all of their interest in the Gray Fox security deed and promissory note. A third document, titled "Agreement," had been executed contemporaneously with the original promissory note, deed to secure debt, and real estate sales agreement. The "agreement" provided that the promissory note "shall be satisfied upon the maturity date of the Note as provided therein in any one of the following manners at the option of HAMILTON MORTGAGE CORPORATION:

"(1) The renewal of the Note in an amount and under terms and conditions mutually acceptable to HAMILTON MORTGAGE CORPORATION and SIERRA ASSOCIATES LIMITED, provided that the said Note is not in default as defined therein; OR

"(2) By payment of cash in an amount acceptable to HAMILTON MORTGAGE CORPORATION; OR

"(3) From the proceeds of the permanent financing procured by either HAMILTON MORTGAGE CORPORATION or SIERRA ASSOCIATES LIMITED . . ."

Following Hamilton's assignment to CINB, Scott Swank was appointed by CINB to monitor their loan on the Gray Fox apartments. CINB also hired Futren Corporation of Atlanta, a real estate management firm, to oversee the operation of Gray Fox apartments and to report to them on its physical appearance and management operations. Futren was composed of Judi Collins and James Rhoden. Swank, Collins, and Rhoden met with Wallace and Whitman in September, 1975, and discussed management of the apartments. Swank stated that Whitman indicated that he would

like to know if CINB would set an amortization schedule for purchase of the apartments. Swank stated that he was unsure whether all of Sierra's expenses were necessary and replied that CINB did not understand the property and its operations well enough to make a determination as to what kind of amortization schedule could be supported by the property. Swank described an amortization schedule as the "combination of the term and the interest rate get you to what you refer to as a constant, at which the monthly payment, or, you know, if it is on a monthly schedule, a monthly payment could be based on." No agreement was reached.

Wallace and Whitman had been discussing the severance of their interests in all of their combined properties during the summer of 1975, but nothing definite had been committed to paper. After the September 1975 meeting in Atlanta with the CINB representatives, Whitman went to Chicago in October, 1975 to speak with Swank. Whitman said he had two reasons for the visit. One — to inform him that he and Wallace were "contemplating dividing our properties or terminating our relationship, which would ultimately end up in a sale or division of any properties that we might jointly own . . ." Secondly, he wanted to see "if we couldn't go ahead and define exactly what their intentions were with regard to this loan, since we only had, basically, six months left before an option had to be selected." Whitman had been contacted by a third party who was interested in acquiring a 49% interest in Sierra and he wanted to know what CINB intended to do. Whitman stated that Swank told him "he did not feel that we should bring in a third party investor just to get some immediate cash . . . Secondly, they said that although they [CINB] certainly could not dictate who bought out who or who continued, that they would prefer that I buy out Mr. Wallace and that I gain, you know, control of the property . . . and that I continue to manage it as my property . . . Mr. Swank agreed that the note on the property would be renewed pursuant to option one of the agreement, relative to that note." Swank does not recall indicating any choice as to who would buy out whom or manage the property but remembered that his comments to Whitman were directed toward local management and he wanted more specific and detailed information on the property.

Whitman agreed that they "did not finalize at that point in time exactly what the rate was, because he said he was not in a position to do that . . . he still had to look at it . . . *The rate of amortization, what would be known as a constant rate of amortization on the loan. He* wasn't in a position to make that decision and *didn't have the authority to make that decision.*" (Emphasis supplied.) Whitman said that on the basis of his discussion with Swank in October, 1975,

that he returned to Atlanta and purchased, in the name of his wife, the 20% interest of his limited partner in Sierra, and 29% of Wallace's 40% interest in Sierra. He also purchased the interest of one of his partners in Heritage Equities, and he had already acquired the interest of his other partner in Heritage. These purchases were made in November, 1975. Thus, Whitman was the sole owner of Heritage Equities, which owned 40% of Sierra, and his wife owned 49%. He had an option to purchase the remaining 11% of Sierra from Wallace.

Swank came to Atlanta in March, 1976 to meet with Whitman. Whitman said that he and Swank verbally agreed on an amortization schedule. He described the terms of the verbal agreement as "... the amount was the same as the original note ... The rate was not stated in terms of a percentage on the original note, nor on the note to be revised ... Sierra Associates, Limited was to have as an operating budget the first $75,000 of gross income on the property on an annualized basis ... $75,000 divided by 12, on a monthly basis. The bank was to receive all the rest of the gross income, so long as that balance did not exceed 50 percent of the gross income ..." The term was to be "15 years or upon the refinancing of the property on a basis which would retire that note, whichever came first." The new loan was to become effective December 1, 1976, and the existing loan was to remain in effect until then.

Swank stated that he and Whitman talked about an amortization schedule at the March meeting but he did not commit himself to any specific terms. Nothing was finalized because, first — Whitman did not ask, and second — he had no authority to make a loan in that amount or any authority to modify or extend the existing loan. It took two loan officers to make a loan up to $250,000 and this loan was over $1,000,000.

Swank's testimony was to the effect that he spent one year trying to understand the operation of the Gray Fox apartments, attempting to find out what their "asset" was worth. They thought the expenditures by Sierra were abnormal and excessive. There was a question as to whether the apartments were being operated or managed as efficiently as possible. No definite decision on an amortization schedule was made in the March meeting with Whitman. He did not agree to a new term for the note or a renewal. He and Futren agreed that it would be advantageous for the Gray Fox apartments to have new management. An appraisal of the property was done and its value was set at $625,000. He discussed these factors with his superiors and they jointly made a decision to offer Whitman two alternatives. In August, 1976, Whitman was offered the choice of an amortization schedule with an interest rate of 10% for 30 years,

with a 5-year balloon note, or a cash sale for $600,000. Whitman rejected the amortization schedule outright, but said he would be interested in buying the property. CINB wanted an answer within 24 hours. The following morning they presented Whitman with a letter to CINB in the form of an offer to purchase the Gray Fox apartments — with a $15,000 downpayment to accompany the letter. This offer was not accepted.

CINB filed this action to appoint a receiver to preserve the assets of the apartments during the advertising period of foreclosure. After a receiver was appointed, CINB amended its petition to allege damages against Whitman for withdrawal of funds for payment of management fees to Heritage. Whitman counterclaimed against CINB for wrongful foreclosure, for libel arising out of CINB's statements that Sierra had defaulted on the note, for fraud, unjust enrichment, and for breach of contract.

Plaintiff's first motion for summary judgment was denied. Plaintiff's renewed motion — seeking only to dismiss defendant's counterclaims, was granted. Defendants appeal. *Held:*

1. The original purchase agreement for the Gray Fox apartments by Sierra from Hamilton was contained in several documents, executed simultaneously. One document was titled "Agreement," in which Hamilton had three options in the collection of the promissory note from Sierra. In essence, the first option was a renewal of the note "in an amount and terms and conditions mutually acceptable" to the parties. The second option was by payment of cash in an amount acceptable to Hamilton. The last option was for payment of the note from proceeds of permanent financing to be procured by Hamilton or Sierra. Collectively, this portion of the agreement was only an agreement to seek to agree in the future, since the negotiators did not, at that point in time, have a meeting of the minds on the essentials of a complete contract. 1 Corbin on Contracts 85, § 29. "The purported second loan 'commitment' is no more than [CINB's] agreement to agree in the future. 'Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect.'" *Hartrampf v. C & S Realty Investors,* 157 Ga. App. 879, 881 (278 SE2d 750); accord: *Wells v. H. W. Lay & Co.,* 78 Ga. App. 364, 367 (50 SE2d 755); *Malone Constr. Co. v. Westbrook,* 127 Ga. App. 709 (194 SE2d 619); *John Bleakley Ford v. Estes,* 164 Ga. App. 547 (1) (298 SE2d 270). " 'An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.' " *Wells v. H. W. Lay & Co.,* 78 Ga. App. 364, 367, supra; accord: *Russell v. City of Atlanta,* 103 Ga. App. 365, 367 (119 SE2d 143). Accordingly, the so-called "option agreement" was not

enforceable as it was nothing more than an "agreement" to agree.

2. Appellant argues that his partial performance, by buying out his partners in Sierra and Heritage was such "part performance as would take this purported agreement from under the Statute of Frauds." See OCGA § 13-5-31 (3) (Code Ann. § 20-402). We do not agree.

(a). As this alleged verbal contract, made in March, 1976, was not to be performed within one year, it came within the Statute of Frauds requiring it to be in writing to be enforceable. OCGA § 13-5-30 (5) (Code Ann. § 20-401); *Yarborough v. Hi-Flier Mfg. Co.,* 63 Ga. App. 725 (1) (12 SE2d 133). Although Whitman and Wallace had discussed division of their jointly owned properties in the summer of 1975 before Whitman went to Chicago to see Swank, no specific division of property was reached until after the October 1975 meeting, and — according to Whitman, the acquisition of Sierra by him was made in reliance upon the verbal agreement between himself and Swank. Part performance required to obviate the Statute of Frauds must be substantial and essential to the contract reached by the parties. *Hudson v. Venture Indus.,* 147 Ga. App. 31, 32 (248 SE2d 9); accord: *Metzgar v. Reserve Ins. Co.,* 149 Ga. App. 404 (254 SE2d 517). The purchase of those portions of Sierra and Heritage Equities stock was not included within the verbal agreement — as related by Whitman, nor was it essential to the contract. See *Cofer v. Wofford Oil Co.,* 85 Ga. App. 444, 450 (69 SE2d 674). "That part performance which will remove a contract from the statute of frauds refers to performance of the provisions of the contract and not to acts done by one because of his belief in and reliance on the agreement." *Spiegel v. Hays,* 103 Ga. App. 293, 301 (119 SE2d 123); *Neely v. Sheppard,* 185 Ga. 771, 780 (196 SE 452); *Smith v. Davidson,* 198 Ga. 231 (3) (31 SE2d 477). "The performance of other acts independent of and not required by the terms of the contract will not be sufficient to constitute part performance so as to bring it within the exception of Code Ann. § 20-402 (3) (now OCGA § 13-5-31 (3))." *Moon v. Stone Mountain Memorial Assn.,* 223 Ga. 696, 698 (157 SE2d 461). " 'A parol contract sought to be enforced as within some exception to the Statute of Frauds . . . must be certain and definite in all essential particulars, and if part performance is relied upon to make [it] enforceable, the part performance must be part performance of an essential element of the contract sought to be proved, and of a character which would render it a fraud on the plaintiff if the defendant refused to comply.' [Cit.]" *Norris v. Downtown LaGrange Dev. Auth.,* 151 Ga. App. 343, 344 (259 SE2d 729).

The October 1975 meeting between Whitman and Swank did not result in a contract and it is not the alleged contract sought to be

enforced. The contract sought to be enforced is alleged to have arisen from the March 1976 meeting between Whitman and Swank in Atlanta. Because the original "agreement" delineating the "options" of Hamilton, and CINB as its assignee, was of no effect and unenforceable, and Whitman's purchase of the shares from his partners in Sierra and Heritage was in reliance on a meeting in October 1975 which did not result in an enforceable contract, and his "part performance" was not an essential element of any contract, but related to a non-existent contract, we find this enumeration to be without merit.

(b). The same rationale, as stated in subsection 2 (a) above, would apply to Whitman's contention that he did not sell his interest in Sierra to a third party so that he could retain control of Sierra in accordance with the desires of CINB. This forbearance was not an essential element of the contract reached by the parties — either under the October 1975 or the March 1976 meeting. No agreement was reached at the October 1975 meeting, and Whitman's purported refusal to sell was made in reliance upon that October 1975 meeting which did not result in a contract. Neither was it contained in the agreement recited by Whitman as a result of the March 1976 meeting.

3. This leaves for resolution the legal result of the March 1976 meeting between Whitman and Swank in which Whitman states he was offered an amortization schedule in which Sierra would keep the first $75,000 of income, and the bank was to receive the remainder of the gross income so long as it did not exceed 50 percent of the gross income. The term was to be "15 years or upon the refinancing of the property on a basis which would retire that note, whichever came first." Noticeably missing from such an agreement is an interest rate. Neither is there a stated monthly amount to pay interest or retire the principal mortgage from which an interest rate could be computed. The phrase "15 years or upon the refinancing of the property on a basis which would retire that note, whichever came first" only confuses the issue rather than supplying a missing key. Does this mean that CINB would take all amounts received over the first $75,000 and cancel the $1,005,327 note at the end of 15 years? Or, does it mean they would take any amount received for any number of years and then refinance any amount of the note remaining due? But what amount would remain due? If there was no interest rate and no set monthly amount due, what amount was left due? The latter portion of this phrase "refinancing of the property on a basis which would retire that note" is subject to the same infirmity as the original agreement. It is an agreement to agree in the future on another agreement and is unenforceable.

(a). As held above, because the alleged verbal contract was not to be performed within one year it came within the Statute of Frauds requiring it to be in writing. OCGA § 13-5-30 (5) (Code Ann. § 20-401).

(b). Every essential element of the contract must be stated. *Norris v. Downtown LaGrange Dev. Auth.,* 151 Ga. App. 343, supra. The amount of interest was not stated nor is there any key which could be used to compute this missing element. A loan agreement which fails to specify an interest rate is unenforceable. *Dolanson Co. v. C & S Nat. Bank,* 242 Ga. 681, 682 (251 SE2d 274); *Bonner v. Wachovia Mtg. Co.,* 142 Ga. App. 748, 750 (236 SE2d 877); *Beasley v. Ponder,* 143 Ga. App. 810 (240 SE2d 111). If the parties do not create a complete binding agreement, the courts are powerless to do it for them, or afford a remedy for a breach. *Scott v. Lewis,* 112 Ga. App. 195, 197 (144 SE2d 460).

(c). Appellant contends his partial performance — by buying out his partners in Sierra and Heritage would take his case out from under the Statute of Frauds. Even if it could be asserted that the partial performance was taken in reliance on a future contract, based upon the earlier meeting, " '[a] parol contract sought to be enforced as within some exception to the Statute of Frauds . . . must be certain and definite in all essential particulars, and if part performance is relied upon to make [it] enforceable, the part performance must be part performance of an essential element of the contract sought to be proved . . ." *Norris v. Downtown LaGrange Dev. Auth.,* 151 Ga. App. 343, 344, supra; accord: *Smith v. Top Dollar Stores,* 129 Ga. App. 60, 63 (198 SE2d 690). The March meeting did not encompass an interest rate and was incomplete and unenforceable, and even if there was action taken in reliance upon the meeting, the part performance was not an essential element of the agreement.

(d). " 'A lender's refusal to make a second loan, or even misrepresentations that it would make a second loan, does not bar the lender from recovery of the amount owed under the first loan." *Hartrampf v. C & S Realty Investors,* 157 Ga. App. 879, 880, supra; accord: *Rizk v. Jones,* 148 Ga. App. 473, 474 (251 SE2d 360). The original promissory note had matured and was unpaid. Foreclosure was permissible.

(e). Swank was a Real Estate officer of CINB. He did not have the authority to renew, extend, or modify Sierra's loan. Whitman was aware of this lack of authority from his October 1975 meeting with Swank. Both of our appellate courts have held that "a bank officer, with or without apparent authority, cannot compromise the institution he represents by promising proposed debtors of the bank that they will be granted a release from their obligations short of

payment of the debt." *Wall v. Fed. Land Bank,* 156 Ga. App. 368, 372 (274 SE2d 753); *First Nat. Bank &c. Co. v. Thompson,* 240 Ga. 494, 495 (241 SE2d 253). Thus, Swank was without authority to bind CINB in the extension or renewal of the existing loan.

(f). Although defendant's counterclaim was based partially in fraud — " 'fraud cannot be predicated upon statements which are promissory in their nature as to future acts.' " *First Nat. Bank &c. Co. v. Thompson,* 240 Ga. 494, 495, supra. Hence, even if Swank had authority to bind the bank, his statements related to future acts which were promissory in nature and an action in fraud cannot be based thereon. *Jackson v. Brown,* 209 Ga. 78, 80 (2) (70 SE2d 756); *Citizens Trust Bank v. Tyler,* 162 Ga. App. 589 (1) (291 SE2d 95). Another reason exists why the trial court did not err in granting summary judgment to appellee on the fraud counterclaim. Although fraud can be predicated on a misrepresentation as to future events, where the defendant knows that the future event will not take place, if the fraud is predicated on a promise which is unenforceable at the time it is made then plaintiff cannot enforce an action for a breach. *Motors Ins. Corp. v. Morgan,* 117 Ga. App. 654, 656 (161 SE2d 382); *Ely v. Stratoflex,* 132 Ga. App. 569 (2) (208 SE2d 583); *Beasley v. Ponder,* 143 Ga. App. 810, supra. Hence, a promise to make a loan, without a specification of an interest rate, made by a bank officer without authorization, is not enforceable and will not support an action for fraud. *Clare Dev. Corp. v. First Nat. Bank,* 243 Ga. 709 (256 SE2d 452).

4. (a). Appellant has not listed as an issue of law, nor argued, nor provided any citation of law, for those portions of its counterclaim relating to unjust enrichment, and libel for declaring the note in default and foreclosure. Those issues are not presented for review and are considered abandoned. *Johnson v. Heifler,* 141 Ga. App. 460 (6) (233 SE2d 853); *Haskins v. Jones,* 142 Ga. App. 153 (1) (235 SE2d 630); Rule 15 (c) (2), Georgia Court of Appeals.

(b). Those remaining portions of appellant's counterclaims are disposed of adversely to appellant in Divisions 1 through 3, above. It was not error for the trial court to grant appellee's motion for summary judgment as to appellant's counterclaims.

*Judgment affirmed. Sognier and Pope, JJ., concur.*

DECIDED JANUARY 10, 1984 —
REHEARING DENIED FEBRUARY 13, 1984 —

*Edward T. M. Garland, Norman Underwood, Robin N. Loeb,* for appellants.

*Peyton S. Hawes, Jr., Julie Childs,* for appellee.