**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

November 1, 2024

# In the Court of Appeals of Georgia

A24A0691. BRIMAR ENTERPRISES, LLC v. MONTGOMERY et al.

A24A1055. HAIRSTON v. MONTGOMERY et al.

DOYLE, Presiding Judge.

These appeals arise from tort and contract claims brought by Sadie and Davis Montgomery against Brimar Enterprises, LLC ("Brimar"), and its sole member, William Hairston (collectively, "the Defendants"), relating to the Defendants' involvement in refinancing the Montgomerys' home, which was pending foreclosure. The trial court entered a default judgment against Brimar and later granted summary judgment against Hairston. In Case No. A24A0691, Brimar appeals from the default judgment, and in Case No. A24A1055, Hairston appeals from the grant of summary

judgment.[1] For the reasons that follow, we affirm in both cases.

The record reflects that the Montgomerys are an elderly[2] couple who have lived at their home in Powder Springs, Georgia, since 1997. In August 2019, the Montgomerys had fallen behind on their mortgage[3] and were facing foreclosure. Having seen the Montgomerys' home in the foreclosure listings, Hairston contacted them and offered to help reinstate their mortgage. Hairston told the Montgomerys that he lived one mile away, that he was a Christian, and that he helped people in the Montgomerys' situation. The Montgomerys asked Hairston whether, in accepting his assistance, they would maintain title to their home in order to leave it to their children, and Hairston assured them that they would.

After agreeing to accept Hairston's assistance, the Montgomerys were directed by Hairston to sign documents that they believed to comprise a mortgage reinstatement loan.[4] The documents that the Montgomerys signed consisted of a promissory note purportedly made between the Montgomerys and Hairston d/b/a

---

[1] Because both cases are based on the same underlying transaction and trial court proceedings, we have consolidated the appeals.

[2] At the time of the transaction, the Montgomerys were both 76 years old.

[3] The Montgomerys' mortgage was serviced by Selene Finance.

[4] At the time of the transaction, the reinstatement amount for the Montgomerys' mortgage was $9,866.81.

Brimar and one of two versions of a quitclaim deed purporting to convey the Montgomerys' home to Hairston d/b/a Brimar.[5] The Montgomerys also received a loan agreement purportedly made between the Montgomerys as borrowers and Hairston d/b/a Brimar as lender. The loan agreement contained in the record does not bear the Montgomerys' signatures.

The promissory note identifies the Montgomerys as owners of the subject property, but it does not set forth any specific loan amount, interest rate, installment amount, or payment period. Instead, the document states that the Montgomerys are to pay Brimar "the dollar amount equal to the amount of the proceeds from the sale" of the subject property. No sale of the property actually occurred, and there were no such proceeds.[6]

The loan agreement states that the Defendants were to loan the Montgomerys $165,000 to be repaid at 6.25 percent interest for a 30-year term, with monthly

---

[5] One version of the quitclaim deed was unrecorded and provided to the Montgomerys, and the other was recorded but not provided to the Montgomerys. The unrecorded version bears Hairston's signature as the grantor. The recorded version contains the Montgomerys' signatures as the grantors.

[6] A transfer tax form that the Defendants filed in connection with the purported transfer of the property lists the Montgomerys as the sellers, lists Hairston d/b/a Brimar as the buyer, indicates that August 23, 2019, was the date of sale, and reflects that the consideration received by the sellers was $0.

installments of $992.50 starting September 1, 2019, and ending August 1, 2049. The document identifies the Montgomerys' home as security and references the purchase of the home from the Montgomerys by the Defendants, stating that the Defendants would retain title to the home until the loan was repaid in full, at which point the Defendants would return title to the Montgomerys. The document further states that in the event of default, the Defendants could demand all outstanding principal and interest, and if the Montgomerys failed to satisfy such demand within ten days, the Defendants would be entitled to repossess the home. The Defendants never gave the Montgomerys $165,000, nor did they pay off the Montgomerys' existing mortgage with such an amount.

The first page of the unrecorded quitclaim deed provided to the Montgomerys is identical to the first page of the recorded quitclaim deed, aside from the recordation file stamp. In both versions, the stated effect of the document is to convey title of the Montgomerys' home to the Defendants for $1 in consideration. Hairston initially signed the second page of the unrecorded quitclaim deed as grantor, but after realizing this, he directed the Montgomerys to sign as grantors on the second page of the quitclaim deed that was recorded.

The Montgomerys gave Hairston third-party authorization to make payments

on their behalf to their mortgage servicer, and Brimar paid $9,866.81 to reinstate their mortgage, proof of which was provided to the Montgomerys. The Montgomerys began making monthly payments of $992.50 to Hairston in September 2019. At that time, the monthly installment amount under the Montgomerys' existing mortgage was $673.24.[7] From September 2019 to May 2021, the Montgomerys paid Hairston $992.50 monthly with the understanding that part of each payment would cover their existing mortgage installments, while the rest would go towards repayment of the $9,866.81 mortgage reinstatement loan. Meanwhile, the Montgomerys continued to live in their home.

In October 2019, the Defendants received a notice indicating that inoperable and/or unregistered vehicles were present at the subject property, which Hairston forwarded to the Montgomerys. The notice indicated that the property and/or the Defendants were potentially in violation of the county code but did not reference the Montgomerys. Additionally, prior to 2020, tax bills for the property had been sent to the Montgomerys and included senior homestead exemptions, but starting in 2020, the bills were sent to the Defendants and no longer reflected these exemptions. In April 2021, the Montgomerys received a notice from their mortgage servicer

---

[7] In June 2020, this amount changed to $616.13.

indicating that their existing monthly mortgage payments would increase from $616.13 to $844.29 effective June 2021. The Montgomerys learned that this increase was due to the removal of their senior homestead exemptions when the Defendants' recorded the quitclaim deed, which alerted them that title to their home was at issue.

In May or June 2021, Hairston notified the Montgomerys that, due to the increase in their existing monthly mortgage payments, their monthly payments to the Defendants would increase to $1,220.66.[8] Hairston told the Montgomerys that the Defendants owned the Montgomerys' home and that unless they paid the increased monthly amount, Hairston would sell the property and force the Montgomerys to find another place to live. The Montgomerys paid the Defendants the increased amount once in June 2021. But when the Montgomerys did not pay this amount again in July 2021, Hairston sent the Montgomerys a letter stating that they were in default of the loan agreement and that unless they corrected the default within ten days, they would have to either repay the outstanding loan balance of $160,251.37 or face eviction.

The Montgomerys contacted the police and reported that the Defendants had

---

[8] Nowhere in the transaction documents is such an increase authorized. The loan agreement and associated amortization schedule both indicate that the Montgomerys' monthly payments to the Defendants would be $992.50 for the duration of the purported 30-year term. Likewise, the loan agreement states that such a modification could occur only via written instrument executed by the Montgomerys and the Defendants.

appropriated title to their home under the pretext of helping them avoid foreclosure. The investigating officer, Pedro Munoz, interviewed the Montgomerys, reviewed the relevant documents, and spoke to Hairston over the phone. Munoz invited Hairston to give an interview, which Hairston declined. Based on his investigation, training, experience, and professional judgment, and independent of any request by the Montgomerys, Munoz applied for, and was granted, an arrest warrant for Hairston charging two counts of felony elder exploitation pursuant to OCGA § 16-5-102 (a). Hairston was arrested and made bond.[9]

Thereafter, the Montgomerys filed the underlying suit against the Defendants, alleging claims of fraud; exploitation of elder persons pursuant to OCGA §§ 16-5-102, 51-1-6, and 51-1-8; violations of the Georgia Residential Mortgage Act ("GRMA"), pursuant to OCGA §§ 7-1-1000 et seq., 51-1-6, and 51-1-8, against Brimar; and requested to set aside the quitclaim deed under OCGA § 23-2-2, for declaratory judgments that the quitclaim deed was not recordable and that the loan was unenforceable, or alternatively, for reformation or creation of a constructive trust. Hairston and Brimar answered (1) raising affirmative defenses, (2) asserting

---

[9] The record does not reflect any resolution of the criminal matter during the proceedings below, and Hairston deposed in May 2022 that he did not think any indictment had been filed.

7

counterclaims for breach of contract, unjust enrichment, or quantum meruit on behalf of Brimar, false arrest and malicious prosecution on behalf of Hairston; and (3) requesting a judicial lien or eviction as to Brimar, punitive damages, and attorney fees. The Montgomerys later amended their complaint to add claims under the Fair Business Practices Act ("FBPA"), OCGA § 10-1-390 et seq., and the Unfair or Deceptive Practices Toward the Elderly Act ("UDPTEA"), OCGA § 10-1-850 et seq.

The Montgomerys filed their complaint against the Defendants on August 19, 2021. Hairston is the owner, sole member, and registered agent of Brimar. Brimar's registered address is 3900 Hemingway Drive, Powder Springs, Georgia 30127.[10] The Montgomerys repeatedly attempted to serve the Defendants at this address to no avail.[11] The Montgomerys then served Brimar through substitute service on the Secretary of State pursuant to OCGA § 14-11-209 (f), the acknowledgment of which was filed on October 25, 2021.

The Defendants filed their joint answer and counterclaims on December 9,

---

[10] This is also Hairston's home address.

[11] Private process servers made at least seven unsuccessful attempts to serve the Defendants. The sheriff's department also tried to serve the Defendants four times without success.

2021.[12] Based on Brimar's untimely answer and failure to pay costs, the Montgomerys filed a motion to strike the answer of, and for default judgment against, Brimar. Brimar responded and moved to open the default, but persisted in its failure to pay costs.[13] By written order, the trial court granted default against Brimar, struck its answer, and denied its motion to open the default, finding that Brimar had answered 45 days after service had been perfected and failed to pay costs as required by OCGA § 9-11-55 (b). Brimar appeals from this order in Case No. A24A0691.

Meanwhile, discovery proceeded, and Hairston invoked the Fifth Amendment consistently throughout written discovery and at his deposition, refusing to answer questions about his interactions with the Montgomerys, the documents associated with the transaction, and the circumstances allegedly giving rise to his counterclaims against them.[14] Hairston deposed that while he claimed no interest in the subject

---

[12] Before filing their answer, the Defendants filed a motion to stay the lawsuit in light of the pending criminal matter.

[13] The Defendants paid a filing fee of $62.40 when they filed the motion to stay, but never paid the $214 in costs reflected for the action.

[14] In response to an interrogatory about the factual basis of Hairston's false arrest and malicious prosecution counterclaims, Hairston stated that he believed that the Montgomerys had provided an incomplete and inaccurate account to the police by not disclosing that the Montgomerys had "grown weary" of the Defendants, that the Defendants had saved them from foreclosure, and that the Defendants had been paying their mortgage. In response to an interrogatory about the factual basis of

property or purported contract with the Mongtomerys, Brimar claimed such an interest.

The Montgomerys moved for summary judgment on their claims and Hairston's counterclaims. Hairston responded with an affidavit that purported to exonerate him from any wrongdoing in his transaction with the Montgomerys. The affidavit confirmed that upon learning that the Montgomerys were facing foreclosure, Hairston contacted them and told them that he could help them save their home. Hairston portrayed this assistance as being limited to the mortgage reinstatement loan but acknowledged that he had the Montgomerys sign a quitclaim deed.[15] The affidavit did not dispute that the Defendants had never given the Montgomerys $165,000 under the purported loan agreement but stated that Hairston had told the Montgomerys that if they defaulted on this loan, Hairston would take the property. Hairston also attested that in July 2021, he mailed them a notice of default, which stated that they had ten days to cure such default.

The trial court granted summary judgment, finding that Hairston had not

---

Hairston's IIED counterclaim, Hairston stated that the Montgomerys had "embarked on a campaign of terror" by instituting criminal and civil proceedings against him.

[15] Hairston claimed that the the Montgomerys understood the transaction because they had initially acquired their home by quitclaim.

controverted the evidence supporting the Montgomerys' claims and failed to submit evidence supporting his counterclaims. Specifically, the trial court found that because the promissory note did not specify a loan amount or loan terms, it was too vague to be enforceable. The trial court also found the loan agreement unenforceable because there was no evidence that it was signed by the Montgomerys or that the Defendants ever loaned them $165,000. As to the quitclaim deed, the trial court found that Hairston had disclaimed any interest in title to the Montgomerys' home and that, even if he had not, the deed was a nullity because the undisputed evidence showed that it was not intended to effect an absolute conveyance of the home. Further, because Hairston had misrepresented the transaction as a mortgage reinstatement loan when in fact it was a mechanism whereby Hairston purported to acquire title to the Montgomerys' home, and because Hairston had failed to provide the Montgomerys with the disclosures required by OCGA § 10-1-393 (b) (20) (C) in connection with the purchase of a home, the trial court found that Hairston had engaged in unfair or deceptive acts or practices in violation of the FBPA. Because the Montgomerys were both over the age of 60 at the time of the subject transaction,[16] the trial court found that Hairston's FBPA violations were committed against elder persons, giving rise to

---

[16] OCGA § 10-1-850 (2) provides that "'[e]lder person' means a person who is 60 years of age or older."

11

liability and penalties under the UDPTEA.[17] The trial court granted partial summary judgment on Hairston's liability as to the Montgomerys' FBPA and UDPTEA claims, leaving open the issue of damages.

As to Hairston's counterclaims for false arrest and malicious prosecution, the trial court found that Hairston had failed to establish a lack of probable cause for his arrest and prosecution and that the Montgomerys had not initiated criminal proceedings against him maliciously. The trial court found that the testimony in Munoz's affidavit stating that he had decided to arrest Hairston based on his investigation of the matter and independent of any requests by the Montgomerys was uncontroverted. As to Hairston's false prosecution counterclaim, the trial court also found that the proceedings had not terminated in Hairston's favor.

The trial court granted summary judgment against Hairston's IIED counterclaim based on a finding that the Montgomerys' conduct towards Hairston, which consisted of pursuing legal recourse to protect their home by calling the police and filing a civil lawsuit, did not constitute extreme or outrageous conduct. The trial

---

[17] OCGA § 10-1-851 provides that "[w]hen any person who is found to have conducted business in violation of [FBPA] . . . is found to have committed said violation against elder or disabled persons, in addition to any civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each violation."

court also found that Hairston had failed to introduce evidence of severe emotional distress, citing Hairston's deposition testimony that he did not need professional help to deal with his alleged distress and that, despite such distress, he was "straight mentally" and "focused mentally." Hairston appeals from this order in Case No. A24A1055, which we address first.

*Case No. A24A1055*

OCGA § 9-11-56 (c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" "A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[18]

1. Hairston first contends that the trial court erred by ruling on the Montgomerys' summary judgment motion because the case was stayed pending Brimar's appeal. This contention lacks merit. The case against Hairston was not stayed by Brimar's appeal.

---

[18] (Punctuation omitted.) *Harco Nat. Ins. Co. v. Eric Knowles, Inc.*, 371 Ga. App. 295, 295-296 (899 SE2d 435) (2024).

"A notice of appeal divests the trial court of jurisdiction to supplement, amend, alter, or modify the judgment while the appeal of that judgment remains pending."[19] Brimar's notice of appeal from the entry of default judgment automatically deprived the trial court of jurisdiction to act in relation to that judgment. "However, matters which are independent of and distinct from the judgment on appeal remain within the jurisdiction of the trial court. The notice of appeal does not deprive the trial court of jurisdiction as to other matters in the same case not affecting the judgment on appeal."[20]

Whether summary judgment was appropriate as to Hairston is independent of whether default judgment was proper as to Brimar — the judgment on appeal. A default judgment as to one defendant does not prevent a trial court from deciding separate issues of liability as to another defendant.[21] Brimar's notice of appeal did not

---

[19] (Punctuation omitted.) *Fred Jones Enterprises, LLC v. Williams*, 331 Ga. App. 481, 483 (1) (771 SE2d 163) (2015), citing OCGA § 5-6-46 (a).

[20] (Punctuation omitted.) Id. See also *Avren v. Garten*, 289 Ga. 186, 190 (6) (710 SE2d 130) (2011) ("The supersedeas that stems from the filing of an application of notice of appeal is limited in that it supercedes only the judgment appealed; it does not deprive the trial court of jurisdiction as to other matters in the same case not affecting the judgment on appeal[.]") (punctuation omitted).

[21] See *Cohran v. Carlin*, 249 Ga. 510, 512 (291 SE2d 538) (1982) (holding that despite the appeal of an order dismissing some but not all defendants from the case, the trial court retained jurisdiction over the action as to the remaining defendant,

act as a supersedeas of the trial court's jurisdiction over Hairston, as to whom the case was still pending. Accordingly, the trial court did not err in making summary judgment determinations as to Hairston, despite the pendency of Brimar's appeal.

2. Hairston next contends, in two related enumerations of error, that summary judgment against Hairston was improper because the trial court either misapplied the summary judgment standard or ignored genuine issues of material fact. We disagree.

(a) *Loan Agreement.* Viewed in the light most favorable to Hairston, the uncontroverted evidence shows no enforceable loan agreement between Hairston and the Montgomerys. The Montgomerys signed the promissory note, which references a loan, but the document fails to identify a loan amount or any loan terms, such as the interest rate, payment amount, or payment period. "Every essential element of a contract must be stated. . . . A loan agreement which fails to specify an interest rate is unenforceable."[22] Moreoever, the promissory note obligates the Montgomerys to pay an amount equal to the proceeds from a sale of their home, a sale that never

---

"and could proceed to enter orders as necessary and appropriate in that matter").

[22] (Citation omitted.) *Sierra Assoc., Ltd. v. Continental Illinois Nat. Bank & Trust Co.*, 169 Ga. App. 784, 791 (3) (b) (315 SE2d 250) (1984).

occurred.[23] "Where the promise to pay is contingent upon the occurrence of a future event as well as the arrival of a future time, it is not an unconditional promise to pay until the issue of fact — whether or not the event will take place — can be determined with reasonable certainty."[24] Thus, even assuming that the promissory note was enforceable, the promise to pay was contingent on an event that did not occur, and therefore, the Montgomerys had no obligation to pay under this provision.

The loan agreement purports to supply the key terms missing from the promissory note, including a loan amount of $165,000, an annual interest rate of 6.25 per cent, a monthly payment of $992.50, and a 30-year payment period. Critically, however, while there is evidence that the Montgomerys received this document, there is no evidence that they signed it. "To create a valid and enforceable contract against . . . property owners, their assent to the alleged contractual terms . . . normally would be required."[25] Even assuming that the Montgomerys had signed or otherwise

---

[23] Hairston deposed that he recognized the promissory note, but when asked what the sale proceeds provision meant, he pled the Fifth Amendment.

[24] (Punctuation omitted.) *Textile Rubber & Chem. Co. v. Thermo-Flex Technologies, Inc.*, 301 Ga. App. 491, 495 (2) (687 SE2d 919) (2009).

[25] *Murawski v. Roland Well Drilling*, 188 Ga. App. 760, 765 (2) (374 SE2d 207) (1988), citing OCGA § 13-3-1 ("To constitute a valid contract, there must be . . . the assent of the parties to the terms of the contract[.]") See also *Carter v. Kim*, 157 Ga. App. 418 (277 SE2d 776) (1981) ("The party asserting the existence of a contract has

assented to the loan agreement, the undisputed record reflects that the $165,000 was never advanced. Such payment was a condition precedent to the enforceability of the loan agreement.[26] The trial court correctly found that there was no enforceable loan between Hairston and the Montgomerys, and thus properly granted summary judgment against Hairston on this issue.

(b) *Fraud.* "[F]raud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff[s] to act or refrain from acting, justifiable reliance by [the] plaintiff[s], and damage to [the] plaintiff[s]."[27] Each of these

---

the burden of proving its existence and its terms.").

[26] OCGA § 13-3-4 ("A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party."). See also *Moore v. Humble*, 368 Ga. App. 672, 675 (1) (890 SE2d 28) (2023) ("In determining whether a contract contains a condition precedent, we look to the language of the agreement itself. If the language is plain and unambiguous and the intent may be clearly gathered therefrom, we need look no further.") (punctuation omitted); *Grier v. Brogdon*, 234 Ga. App. 79, 80 (1) (505 SE2d 512) (1998) ("A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party. Until compliance with this condition precedent the contract is not enforceable.") (citation and punctuation omitted).

[27] *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989). See also *Grand Master Contracting, LLC v. Lincoln Apt. Mgmt. Ltd. Partnership*, 314 Ga. App. 449, 451 (2) (724 SE2d 456) (2012) ("The tort of fraudulent misrepresentation has five essential elements. . . . : (1) that [the defendant] made false representations; (2) that [the defendant] knew the representations were false at the time (scienter); (3) that [the defendant] made the representations intending to deceive [the plaintiffs] and induce [them] to perform the work; (4) that [the plaintiffs] justifiably relied upon such

elements is satisfied by the undisputed material record here. Although the record reflects that the Montgomerys signed the quitclaim deed, there is no genuine issue as to the material fact that the Montgomerys understood and intended the transaction with Hairston to be a mortgage reinstatement loan as opposed to a conveyance of title to their home. Hairston represented the transaction as a mortgage reinstatement loan that would allow the Montgomerys to maintain ownership of their home. Hairston gained the Montgomerys' trust by representing that he was a Christian neighbor who helped people in the Montgomerys' situation. Hairston confirmed the Montgomerys' understanding that the transaction was a mortgage reinstatement loan by paying $9,866.81 to reinstate their mortgage and allowing them to continue living in their home. And Hairston provided the Montgomerys with copies of documents, but the only document they signed was the promissory note, which identified them as the owners of the home.

Meanwhile, Hairston did not provide the Montgomerys with a copy of the signed quitclaim deed that he recorded. He then proceeded to pay their mortgage for them with their money for nearly two years, taking a $319.25 monthly premium from September 2019 to May 2020, and a $376.37 monthly premium from June 2020 to

representations; and (5) that [the defendant's] misrepresentations resulted in damages and loss to [the plaintiffs].").

18

May 2021, in recoupment of the $9,866.81 in mortgage reinstatement costs. In June 2021, when the Montgomerys' underlying mortgage payments increased to $844.29 due to the removal of their senior homestead exemptions, which Hairston had caused by recording the purported quitclaim deed, Hairston evidently determined that $148.21 monthly premiums were not a satisfactory way to recover the remaining $2,477.12 in reinstatement costs, so he unilaterally raised the Montgomerys' monthly payments to $1,220.66, a modification unauthorized by the terms of the transaction documents. Hairston told the Montgomerys that unless they paid the increased monthly amount, he would liquidate the property and evict them. When the Montgomerys paid this increased amount only once before refusing to do so in July 2021, Hairston sent notice to the Montgomerys that they had ten days to correct the default, otherwise they would have to either pay $160,251.37[28] or be evicted.

Hairston misrepresented the transaction with the Montgomerys as a mortgage reinstatement loan, when in fact it was a means to acquire title to their home. Hairston's later statements to the Montgomerys that he owned the property and

---

[28] At this point, Hairston had $2,100.75 in outstanding mortgage reinstatement costs to recoup. Assuming the Montgomerys had continued paying as directed and that Hairston would implement no further increases of the Montgomerys' monthly payments over the life of the purported loan, Hairston stood to gain an additional $126,836.69 in monthly premiums by August 2049 on a $2,100.75 balance.

would evict them if they failed to cure the purported default demonstrate that he knew his initial representations were false. That Hairston specifically intended to induce the Montgomerys to convey title to their home pursuant to his willful misrepresentations is shown by the fact that he first inadvertently signed the quitclaim deed as grantor, but upon realizing this, he had the Montgomerys sign the quitclaim deed as grantors. Hairston gave the Montgomerys reason to rely on his misrepresentations as to the nature of the transaction by telling them that he was trustworthy and helped people in their situation and by assuring them that they would be able to maintain ownership of their home. Finally, the Montgomerys were harmed by Hairston's misrepresentations in that they lost title to their home, their property taxes and mortgage payments increased, and they suffered emotional and physical turmoil as a result of realizing that they had lost title to their home. The gross inadequacy of the benefit the Montgomerys received from this transaction is further evidence of fraud.[29] The trial court correctly found that, based on Hairston's representations, the Montgomerys were induced into a transaction they did not knowingly enter into, and that the quitclaim deed was due to be set aside. Accordingly, the trial court properly

---

[29] (Punctuation omitted.) *Durrence v. Durrence*, 267 Ga. 280, 282 (476 SE2d 741) (1996) ("[I]nadequate price, taken in connection with other circumstances of a suspicious nature, [may raise] such a vehement presumption of fraud as will authorize a court to set aside the conveyance.").

granted summary judgment against Hairston on these issues.

(c) *FBPA.* As to the Montgomerys' FBPA claim, the undisputed material record supports the trial court's grant of partial summary judgment against Hairston on the issue of liability. The FBPA prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]"[30] The FBPA specifically prohibits "[r]epresenting that moneys provided to or on behalf of a debtor . . . in connection with property used as a dwelling place by said debtor, are a loan if in fact they are used to purchase said property[.]"[31] "[A]ny such misrepresentation upon which is based the execution of a quitclaim deed or warranty deed by that debtor shall authorize that debtor to bring an action . . . to cancel the deed pursuant to . . . [OCGA §] 23-2-60[.]"[32]

Hairston represented that the mortgage reinstatement funds provided to the Montgomerys were a loan, when in fact they were used to acquire title to the Montgomerys' home. Further, in acquiring title to the Montgomerys' home in this manner, Hairston failed to provide the Montgomerys with required disclosures under

---

[30] OCGA § 10-1-393 (a).

[31] OCGA § 10-1-393 (b) (20) (A).

[32] Id.

OCGA § 10-1-393 (b) (20) (C), including contractual language stating in plain and bold language that the subject transaction was a sale;[33] confirmation, signed by both parties, that the provisions of the agreement had been fully explained to the Montgomerys and that they understood that under the agreement they were selling their home;[34] and a notice as a cover sheet to the closing documents informing the Montgomerys that they had ten days to cancel the purchase.[35]

Hairston's conduct presents harm to the consumer public, and the public interest is served by a judgment against Hairston under the FBPA. Hairston deposed that he has operated several businesses, including two businesses dealing in real estate. He has acquired at least 16 homes through transactions whereby he obtained title to the homes by quitclaim deed and paid little to no consideration. Hairston deposed that he is eager to pursue his real estate business and that the Montgomerys' lawsuit has prevented him from doing so. Accordingly, the trial court did not err in granting

---

[33] OCGA § 10-1-393 (b) (20) (C) (i).

[34] See OCGA § 10-1-393 (b) (20) (C) (ii).

[35] See OCGA § 10-1-393 (b) (20) (C) (iv).

partial summary judgment as to Hairston's liability under the FBPA.[36]

(d) *UDPTEA*. As to the Montgomerys' UDPTEA claim, the Montgomerys were both elder persons within the meaning of the UDPTEA.[37] Thus, because all other elements required for an UDPTEA violation are met here as set forth in Division 2 (c) above, the trial court properly granted partial summary judgment as to Hairston's liability under the UDPTEA.[38]

(e) *Hairston's False Arrest and Malicious Prosecution Counterclaims*. The trial court correctly granted summary judgment against Hairston's counterclaims for false arrest and malicious prosecution. The essential elements of a claim for false arrest are: "An arrest under the process of law, without probable cause, when made maliciously[.]"[39] "In such an action, it is also essential to show that the prosecution

---

[36] See *Zeeman v. Black*, 156 Ga. App. 82, 86 (273 SE2d 910) (1980) ("[W]e have no doubt that a single instance of an unfair or deceptive act or practice is a sufficient predicate upon which to base a claim for damages under [the FBPA] if the public consumer interest would be served thereby").

[37] See OCGA § 10-1-850 (2).

[38] An FBPA violation against an elder person is a violation of the UDPTEA. "When any person who is found to have conducted business in violation of Article 15 . . . of this chapter is found to have committed said violation against elder or disabled persons, in addition to any civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each violation." OCGA § 10-1-851. Article 15 includes the FBPA.

[39] OCGA § 51-7-1.

terminated in favor of the [arrestee]."[40] The required elements for malicious prosecution are: "A criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted[.]"[41] It is also necessary for a claim of malicious prosecution that the prosecution has terminated in favor of the claimant.[42] "[N]either false arrest nor malicious prosecution claims are favored under Georgia law. It is public policy to encourage citizens to bring justice to those who appear guilty."[43] The record does not show whether the criminal proceedings that the Montgomerys initiated against Hairston have terminated favorably to him. Moreover, claims for false arrest and malicious prosecution "may successfully be defended by an uncontroverted affidavit of the arresting officer that the decision to arrest [the] plaintiff was made solely by him in the exercise of his

---

[40] *Desmond v. Troncalli Mitsubishi*, 243 Ga. App. 71, 74 (2) (532 SE2d 463) (2000).

[41] OCGA § 51-7-1.

[42] See *Hardee's Food Systems, Inc. v. Hall*, 184 Ga. App. 586, 589 (5) (362 SE2d 143) (1987) ("In order to prevail on a malicious prosecution claim, the plaintiff must show (1) a prosecution instituted maliciously and (2) without probable cause which (3) has terminated favorably to the plaintiff.").

[43] *Desmond*, 243 Ga. App. at 74 (2).

professional judgment and independently of any exhortations by the defendants."[44] The record in this case contains such an affidavit. Accordingly, the trial court correctly granted summary judgment on Hairston's false arrest and malicious prosecution counterclaims.

(f) *Hairston's Intentional Infliction of Emotional Distress Counterclaim.* To prevail on a claim of IIED, "a plaintiff must demonstrate that: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe."[45] The record reflects that the Montgomerys' conduct towards Hairston consisted of pursuing legal recourse to protect their home by calling the police and filing a civil lawsuit. As a matter of law, such conduct does not rise to the level of extreme or outrageous conduct.[46]

---

[44] *Jacobs v. Shaw*, 219 Ga. App. 425, 426 (1) (465 SE2d 460) (1995), overruled in part on other grounds by *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 362-363 (4) (713 SE2d 456) (2011).

[45] (Punctuation omitted.) *Doe v. Roe*, 362 Ga. App. 23, 29 (3) (d) (864 SE2d 206) (2021).

[46] See *Kirkland v. Tamplin*, 285 Ga. App. 241, 245 (2) (645 SE2d 653) (2007) ("[T]he defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (punctuation omitted). See also *Garcia v. Shaw Indus., Inc.*, 321 Ga. App. 48, 52-54 (741 SE2d 285) (2013) (holding that a defendant did not act

Moreover, the record contains no evidence that the emotional distress Hairston suffered as a result of the Montgomerys' conduct was severe. Hairston deposed that he did not seek professional help to deal with his alleged distress and that, despite such distress, he was "straight mentally" and "focused mentally." As a matter of law, Hairston's emotional distress does not rise to the level of severity to support a claim of IIED.[47] Thus, the trial court properly granted summary judgment against Hairston's as to this counterclaim.

*Case No. A24A0691*

---

in an extreme or outrageous manner by filing an accurate report of the plaintiff's suspected crime that led to her eventual arrest); *Rolleston v. Huie*, 198 Ga. App. 49, 51 (2) (400 SE2d 349) (1990) ("[T]he mere filing of a lawsuit is not the type of humiliating, insulting[,] or terrifying conduct which will give rise to a claim for the intentional infliction of emotional distress."), overruled in part on other grounds by *Sewell v. Cancel*, 295 Ga. 235, 239 n. 2 (759 SE2d 485) (2014).

[47] *Abdul-Malik v. AirTran Airways, Inc.*, 297 Ga. App. 852, 858 (1) (678 SE2d 555) (2009) ("Emotional distress includes all highly unpleasant mental reactions[.] . . . It is only where it is extreme that liability arises. The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it.") (punctuation and emphasis omitted). See also *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 820 (3) (720 SE2d 270) (2011) (holding that the plaintiff failed to demonstrate sufficiently severe emotional distress where the plaintiff did not "provide any evidence that the defendants' conduct caused him to take medication or seek medical or psychological help."); *Jones v. Fayette Family Dental Care, Inc.*, 312 Ga. App. 230, 233 (718 SE2d 88) (2011) (holding that the plaintiff's distress did not rise to the necessary level of severity where the plaintiff "sought no treatment from any type of doctor, psychiatrist, psychologist, or counselor") (physical precedent only).

3. In this case, Brimar challenges the entry of default judgment against it. Brimar contends that the entry of default should be reversed because substitute service on Brimar through the Secretary of State was improper. We disagree.

"When a defendant questions the sufficiency of service, the burden is on him to come forward with evidence that service was not proper. [Such] evidence [must be] not only clear and convincing, but the strongest of which the nature of the case will admit."[48] "Factual disputes regarding service are to be resolved by the trial court, and the court's findings will be upheld if there is any evidence to support them."[49]

A limited liability company must maintain a registered office at which its registered agent may be served.[50] OCGA § 14-11-209 (f) provides that when a registered agent cannot with reasonable diligence be found at the registered office,

> the Secretary of State shall be an agent of such limited liability company
> upon whom any process, notice, or demand may be served. Service on
> the Secretary of State of any such process, notice, or demand shall be
> made by delivering to and leaving with him or her or with any other

---

[48] (Citation and punctuation omitted.) *Norman Svc. Indus., Inc. v. Lusty*, 168 Ga App. 164, 164-165 (1) (308 SE2d 411) (1983).

[49] (Punctuation and emphasis omitted.) *Vasile v. Addo*, 341 Ga. App. 236, 240 (2) (800 SE2d 1) (2017).

[50] See OCGA § 14-11-209 (a).

person or persons designated by the Secretary of State to receive such service a copy of such process, notice, or demand. The plaintiff or his or her attorney shall certify in writing to the Secretary of State that the limited liability company failed either to maintain a registered office or appoint a registered agent in this state and that he or she has forwarded by registered or certified mail or statutory overnight delivery such process, notice, or demand to the most recent registered office listed on the records of the Secretary of State and that service cannot be effected at such office.

If a registered office is "generally unattended by the registered agent, then the registered office is not being 'continuously maintained' within the meaning of the law."[51] "Determinations as to whether reasonable diligence was exercised in matters related to service of process are within the discretion of the trial court and will not be disturbed on appeal absent abuse."[52]

Pretermitting whether Brimar waived its defective service claim,[53] we hold that

---

[51] *Hooks v. McCondichie Properties 1*, 330 Ga. App. 583, 587 (1) (767 SE2d 517) (2015) (construing a parallel statutory provision applicable to limited partnerships).

[52] *McClendon v. 1152 Spring Street Assoc.-Georgia*, 225 Ga. App. 333, 336-337 (484 SE2d 40) (1997) (holding that four unsuccessful service attempts on a registered agent on four separate days demonstrated reasonable diligence authorizing substitute service).

[53] See *Yeremian v. Ellis*, 239 Ga. App. 805, 807 (1) (b) (521 SE2d 596) (1999) ("[I]nsufficient service . . . must be raised before or at the time of pleading. OCGA §

the trial court correctly found that substitute service was both authorized and properly executed here. The Montgomerys unsuccessfully attempted to serve Brimar at its registered address at least 11 times over the course of nearly two months before resorting to substitute service. The trial court did not abuse its discretion by finding that these efforts constituted reasonable diligence sufficient to authorize substitute service.[54]

The record contains ample evidence that the Montgomerys complied with the requirements of OCGA § 14-11-209 (f) in effecting substitute service on Brimar. The Montgomerys served the Secretary of State with a copy of the summons and complaint. The Montgomerys' attorney certified in writing to the Secretary of State that Brimar had failed to maintain a registered office, that she had forwarded a copy of the summons and complaint to Brimar's registered office by certified mail, and that service could not be effected at this office. The Montgomerys' attorney also

9-11-12 (b). Failure to raise [this defense] either in the answer or by motion filed before or simultaneously with the answer constitutes a waiver of [this defense]. OCGA § 9-11-12 (h).'') Brimar failed to raise defective service as an affirmative defense in both its pre-answer motion to stay and its answer. Further, Brimar's answer admitted all service-related allegations in the Montgomerys' complaint.

[54] Brimar points out that its registered agent ''runs a commercial janitorial company and therefore is on reverse cycle.'' But this fact only reinforces the conclusion that Brimar was not maintaining a registered office for purposes of service of process as required by law.

confirmed in a separate affidavit that Brimar was not maintaining a registered office and that she had forwarded a copy of the process to Brimar's registered office as listed in the Secretary of State's records. Based on this record, the trial court correctly found that substitute service was proper.

4. Brimar next contends that the trial court lacked a factual or legal basis to find Brimar in default and to grant remedies pursuant to the default. Brimar's contention is without merit.

To the extent that Brimar intends this enumeration as a challenge to the factual findings supporting the entry of default, its argument fails. The trial court's order found that the Montgomerys had perfected service on Brimar on October 25, 2021, and that Brimar did not answer until December 9, 2021, 45 days later. By failing to answer within 30 days after service,[55] Brimar automatically went into default.[56] Moreover, the trial court's order found that Brimar had not paid the costs required

---

[55] See OCGA § 9-11-12 (a) ("A defendant shall serve his answer within 30 days after the service of the summons and complaint upon him, unless otherwise provided by statute.").

[56] See OCGA § 9-11-55 (a) ("If in any case an answer has not been filed within the time required by this chapter, the case shall automatically become in default unless the time for filing the answer has been extended as provided by law.").

to open the default.[57] Such payment "is a condition precedent for opening default under OCGA § 9-11-55 (b). Merely offering to pay costs, as here, is insufficient. When this statutory requirement is not met, the trial court lacks discretion to open the default."[58]

Inasmuch as Brimar styles this enumeration as a critique of the relief granted pursuant to the entry of default, its argument fails here as well. The trial court's order pronounced the loan agreement unenforceable and annulled the quitclaim deed. Both of these remedies were appropriate. "Under OCGA § 9-11-55 (a), the effect of a default judgment is judgment to the plaintiff as if every item and paragraph of the complaint or other original pleading were supported by proper evidence."[59]

The Montgomerys' complaint alleged that Brimar never loaned them $165,000 as promised in the loan agreement. This was a condition precedent to the enforceability of the loan agreement.[60] The complaint also alleged that, on behalf of

_____

[57] OCGA § 9-11-55 (b) ("[T]he court, in its discretion, upon payment of costs, may allow the default to be opened . . .").

[58] (Punctuation omitted.) *Freese II, Inc. v. Mitchell*, 318 Ga. App. 662, 663 (1) (734 SE2d 491) (2012).

[59] (Punctuation omitted.) *EnduraCare Therapy Mgmt. v. Drake*, 298 Ga. App. 809, 811 (1) (681 SE2d 168) (2009).

[60] OCGA § 13-3-4 ("A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party.") See also *Moore*, 368

Brimar, Hairston represented the transaction with Brimar as a mortgage reinstatement loan, when in fact its effect was to transfer ownership of the Montgomerys' home to Brimar via quitclaim deed, contrary to the Montgomerys' understanding and intentions in entering into the transaction. The complaint alleged that Hairston, on behalf of Brimar, willfully made this misrepresentation with the intention and result of inducing the Montgomerys to sign over title to their home. The complaint also alleged that Hairston, on behalf of Brimar, gave the Montgomerys reason to rely on his misrepresentations by assuring them that the transaction would allow the Montgomerys to retain title to their home and leave it to their children. Finally, the complaint alleged that the Montgomerys were harmed by the loss of title to their home and the increased property taxes associated with the transfer of ownership. This is fraud.[61] And "[f]raud will authorize equity to annul conveyances, however solemnly executed."[62] The well-pled allegations in the complaint authorized the trial court to

---

Ga. App. at 675 (1); *Grier*, 234 Ga. App. at 80 (1).

[61] See *Crawford*, 258 Ga. at 806; *Grand Master Contracting, LLC*, 314 Ga. App. at 451 (2). Each of the elements of fraud is well-pled here. The gross inadequacy of the purchase price as alleged in the complaint — $9,866.81 in reinstatement costs in exchange for title to a home worth at least $177,000 — is a further indicator of fraud. See *Durrence*, 267 Ga. at 282.

[62] OCGA § 23-2-60.

declare the loan agreement unenforceable and set aside the quitclaim deed.

5. Finally, Brimar contends that the trial court erred by not establishing personal jurisdiction over Brimar before requiring Brimar to pay costs to open the default. Pretermitting whether it is waived,[63] this contention lacks merit.

Brimar is a domestic limited liability company incorporated in Georgia, authorized to transact business in Georgia, and with its principal place of business in Georgia. As such, it is a resident corporation properly subject to personal jurisdiction.[64] The trial court did not err in this respect.

*Judgments affirmed. Hodges and Watkins, JJ., concur.*

---

[63] Failure to raise lack of personal jurisdiction in either the answer or motion filed before or simultaneously with the answer operates as a waiver of this claim. See *Yeremian*, 239 Ga. App. at 807 (1). Brimar failed to raise this jurisdictional challenge in both its pre-answer motion to stay and its answer, and Brimar's answer explicitly admitted all jurisdictional allegations in the complaint.

[64] See *McCall v. Cooper Tire & Rubber Co.*, 355 Ga. App. 273, 274 (843 SE2d 925) (2020) ("Georgia residents are, without question, subject to personal jurisdiction in this state."), citing *Watts v. Allstate Ins. Co.*, 214 Ga. App. 462, 463 (448 SE2d 55) (1994) ("Georgia courts may exercise personal jurisdiction over Georgia residents, of course.").